1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
9                                    AT TACOMA

10   CAMERON J. SHALLOW,

11                   Plaintiff,            CASE NO. 11cv5162-RBL-JRC

12          v.                             REPORT AND
                                           RECOMMENDATION ON
13   MICHAEL J. ASTRUE, Commissioner       PLAINTIFF'S COMPLAINT
     of the Social Security Administration,
14                                         NOTING DATE: June 1, 2012

15                   Defendant.

16

17          This matter has been referred to United States Magistrate Judge J. Richard

18   Creatura pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Judge Rule MJR

19   4(a)(4), and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261,

20   271-72 (1976). This matter has been fully briefed (see ECF Nos. 29, 30, 33).

21          In this matter, the ALJ relied improperly on her own interpretation of mental status

22   examination results over the interpretation of the treating psychiatrist who performed the

23   examinations, Dr. Crabbe. The ALJ's failure to credit fully an opinion of Dr. Crabbe, a

24

treating physician, also was based in part on erroneous findings. Therefore, this matter should be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) to the Commissioner for further consideration.

<u>BACKGROUND</u>

Plaintiff, CAMERON J. SHALLOW, was twenty five years old on his alleged onset date of disability of March 31, 2003 (Tr. 51, 61). Plaintiff was hospitalized with a concussion at age eight and suffered from encephalitis at age ten (Tr. 321). He received special education assistance in junior high school (<u>id.</u>).

During eighth grade, plaintiff was hospitalized for five months for depression and suicidal thoughts (Tr. 545). According to the discharge summary, "there were several instances in which he required seclusion and restraint because of agitated and potentially self-destructive behavior" (<u>id.</u>). As indicated in the summary by Dr. Steven Barnett, M.D. ("Dr. Barnett"), plaintiff "particularly had difficulties in the area of peer relationships" (<u>id.</u>). Dr. Barnett indicated his observation that plaintiff was "nearly phobic in the degree of his avoidance of group activities" and that plaintiff typically would "act in overtly inappropriate ways, or be disruptive" (Tr. 545, 546). According to Dr. Barnett, plaintiff "tended to behave in ways throughout his hospital stay that provoked rejection from his peers" (Tr. 546). Regarding plaintiff's ability to concentrate, Dr. Barnett indicated that during his second month at the hospital, his "impulsivity, distractability, and shortened attention span were quite in evidence," and he was medicated for these demonstrated symptoms (<u>see</u> Tr. 546-47). Plaintiff was discharged with the diagnoses of Tourette's

disorder, by history, as well as obsessive compulsive disorder and attention deficit hyperactivity disorder (ADHD) (Tr. 545).

As an adult, in September, 2004, plaintiff began receiving mental health treatment (see Tr. 392-400). Plaintiff reported being depressed (Tr. 452). On November 9, 2004, Advanced Registered Nurse Practitioner Marne Nelson ("ARNP Nelson") performed a mental status examination of plaintiff and opined that plaintiff presented as somewhat depressed and anxious (Tr. 455). Although she conducted no formal memory testing, she opined that his memory "seemed grossly intact" (id.). She indicated that plaintiff seemed "to have developed personality traits, perhaps the full disorder, with dependent traits, avoidant traits, and borderline personality traits" (Tr. 455-56).

On August 3, 2005, ARNP Nelson observed that plaintiff was "euthymic and ha[d] a subdued affect" (Tr. 434). She noted that plaintiff reported doing well and that his wife reported that he had not had any "episodes" of anger in three months (id.). ARNP Nelson assessed that plaintiff was stable (Tr. 435).

Advanced Registered Nurse Practitioner Dwight Bushue ("ARNP Bushue") first evaluated plaintiff on December 7, 2005 (see Tr. 421). On February 9, 2006, ARNP Bushue indicated his opinions regarding plaintiff's degree of limitation in a number of areas, including his opinion that plaintiff suffered from marked impairments (the highest level of impairment) in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and

length of rest periods (Tr. 352-53). ARNP Bushue also opined that plaintiff suffered from moderate limitations in a number of work-related abilities (see Tr. 352-54). ARNP Bushue provided a narrative comment, explaining his opinion (see Tr. 354). On April 13, 2006, ARNP Bushue assessed that plaintiff had stabilized and that his anger episodes had diminished (Tr. 383).

Plaintiff's July 6, 2006 mental status examination by Ms. Claudia David, MA ("Ms. David") revealed plaintiff's assessed flattened affect; anxious and cautious mood; as well as his low insight (see Tr. 370). Ms. David observed plaintiff's little eye contact and that he fidgeted with his hands throughout the session (id.). She opined that plaintiff demonstrated "high cognitive capacity and low social skills" (id.).

On July 19, 2006, Ms. David similarly observed plaintiff's limited eye contact and that he was agitated (Tr. 372). Ms. David observed plaintiff's flattened affect and anxious mood on August 9, 2006 (Tr. 365). She noted that plaintiff would not speak without his wife present (id.). On August 16, 2006, Ms. David again observed plaintiff's flattened affect as well as his anxious and bored mood (Tr. 364). She noted that he was unfocused, uncommunicative and did not make eye contact (id.).

On September 5, 2006 ARNP Bushue indicated plaintiff's report of difficulty concentrating and focusing and that he was irritable (Tr. 362). ARNP Bushue assessed that plaintiff was suffering from depression, but that it was not severe (see id.). ARNP Bushue indicated that plaintiff would be prescribed Celexa (id.).

On December 15, 2006, Dr. Richard A. Crabbe, M.D., psychiatrist, ("Dr. Crabbe") performed a mental status examination and evaluation of plaintiff (see Tr. 415-17). He

noted plaintiff's subjective reports of depressed mood and irritability (Tr. 415). Dr. Crabbe also observed plaintiff's constricted, sad affect (Tr. 416). He indicated that plaintiff could not remember the three items that he was asked to remember (id.).

Dr. Crabbe indicated that he had assessed plaintiff and determined that plaintiff was depressed (id.). Dr. Crabbe diagnosed plaintiff with major depressive disorder, recurrent, without psychosis; ADHD; anxiety disorder NOS; and rule out generalized anxiety disorder (Tr. 416). Dr. Crabbe assessed that plaintiff's global assessment of functioning ("GAF") was 50 and indicated his plan that plaintiff continue with Celexa at 10 milligrams daily (id.).

On February 2, 2007, Dr. Crabbe evaluated plaintiff and performed a mental status examination (Tr. 414). Dr. Crabbe made his objective observation that plaintiff demonstrated constricted affect (see id.). He also opined that plaintiff "clearly" had ADHD based on the form plaintiff filled out (id.).

On June 4, 2007, Dr. Crabbe indicated his agreement with the February 9, 2006 assessment by ARNP Bushue regarding plaintiff's marked impairments in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (see Tr. 402-06). Dr. Crabbe indicated his agreement with ARNP Bushue's opinion regarding plaintiff's moderate limitations and the rest of Dr Bushue's opinion as well (id.).

On June 15, 2007, Dr. Crabbe evaluated plaintiff for at least the third time and assessed that although plaintiff's mood was irritable, his mental status was within normal limits (see Tr. 544). Plaintiff had discontinued using his prescription medication (Wellbutrin) due to side effects and Dr. Crabbe indicated his plan to change plaintiff's medication and start him on Abilify (id.). Dr. Crabbe indicated his assessment that plaintiff was suffering from ADHD and depression (id.).

The following month, on July 16, 2007, Dr. Crabbe evaluated plaintiff and performed another mental status examination (Tr. 543). He indicated the report of plaintiff's wife that plaintiff was easier to live with now that he was taking Abilify (see id.). Dr. Crabbe assessed that plaintiff had obtained "some benefit" from Abilify but was having sleep difficulties (id.). After discussion with plaintiff and plaintiff's wife, Dr. Crabbe indicated his plan to add Trazodone to plaintiff's medications for sleep (see id.).

On January 28, 2008, Dr. Crabbe evaluated plaintiff for at least the fifth time and performed yet another mental status examination (Tr. 542). Dr. Crabbe noted the indication from plaintiff's wife that plaintiff was feeling anxious much of the time, but that he was tired and spending much time sleeping (id.). Dr. Crabbe noted that plaintiff stopped taking the Trazodone because it made him tired and that plaintiff's mood was depressed (id.). Dr. Crabbe also indicated his objective observation that plaintiff demonstrated a constricted affect (id.). Dr. Crabbe assessed that plaintiff was anxious about money and that he was depressed after being taken off of the Wellbutrin (id.). He indicated his plan to prescribe again Wellbutrin for plaintiff's depression (id.).

Plaintiff has held a number of jobs, but testified that he was fired from most of his jobs for an inability to perform the task as assigned (see Tr. 576; see also Tr. 225-28; but see, e.g., Tr. 228 (delineating other reasons for leaving jobs, such as, "I quit this job because I needed to be with my wife who was depressed and suicidal")). However, plaintiff's testimony reflects little insight that his poor employment performance may have resulted from his alleged impairments or habitual patterns of interacting with others (see id. ("there's always, you know, one or two employees that just make everybody else look bad")). Plaintiff also provided numerous other reasons for leaving some of his different jobs, as noted by the ALJ (see Tr. 27 (citing Tr. 225-28)).

The ALJ found that plaintiff suffered from the severe medically determinable impairments of mild facet arthropathy at L5-S1; depression and personality disorder (Tr. 21). The ALJ also found that plaintiff had difficulties with social functioning, and found that plaintiff "should have no contact with the general public" (Tr. 22, 23).

PROCEDURAL HISTORY

Plaintiff protectively filed Supplemental Security Income and Disability Insurance benefits on March 30, 2004 (Tr. 51-53, 61). His applications were denied initially and following reconsideration (Tr. 42-43, 45-48, 61). His requested hearing was held before Administrative Law Judge Marguerite Schellentrager ("the ALJ") on July 26, 2007 (Tr. 61, 589-638). On October 11, 2007, the ALJ issued a decision in which she found that plaintiff was not disabled pursuant to the Social Security Act (Tr. 58-75).

On February 19, 2009, plaintiff's claims were remanded for a new hearing by the Appeals Council (Tr. 54-57). A second video hearing was held before the ALJ on July 8,

2009 (Tr. 554-88). On November 30, 2009, the ALJ again issued a decision in which she found that plaintiff was not disabled pursuant to the Social Security Act (Tr. 16-34).

On December 28, 2010, the Appeals Council denied plaintiff's request for review, making the November 30, 2009 written decision by the ALJ the final agency decision subject to judicial review (Tr. 6-8). See 20 C.F.R. § 404.981. In March, 2011, plaintiff filed a complaint seeking judicial review of the ALJ's written decision (see ECF Nos. 1, 3). Defendant filed the sealed administrative record in this matter ("Tr.") on July 12, 2011 (see ECF No. 14). In his opening brief, plaintiff challenges the ALJ's review of (1) the medical evidence; (2) the lay evidence; (3) plaintiff's testimony and credibility; and, (4) plaintiff's residual functional capacity ("RFC") (see ECF No. 29, p. 2). Plaintiff also raises the issue of whether or not the ALJ erred by basing her steps four and five findings on an incorrect RFC (id., pp. 2-3).

## STANDARD OF REVIEW

Plaintiff bears the burden of proving disability within the meaning of the Social Security Act (hereinafter "the Act"). Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999); see also Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). The Act defines disability as the "inability to engage in any substantial gainful activity" due to a physical or mental impairment "which can be expected to result in death or which has lasted, or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Plaintiff is disabled under the Act only if plaintiff's impairments are of such severity that plaintiff is unable to do previous work, and cannot, considering the plaintiff's age, education, and work experience, engage in any other

substantial gainful activity existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social security benefits if the ALJ's findings are based on legal error or not supported by substantial evidence in the record as a whole. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (*citing* Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1999)). "Substantial evidence" is more than a scintilla, less than a preponderance, and is such "'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989) (*quoting* Davis v. Heckler, 868 F.2d 323, 325-26 (9th Cir. 1989)); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). Regarding the question of whether or not substantial evidence supports the findings by the ALJ, the Court should "'review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" Sandgathe v. Chater, 108 F.3d 978, 980 (1996) (per curiam) (*quoting* Andrews, supra, 53 F.3d at 1039). In addition, the Court "'must independently determine whether the Commissioner's decision is (1) free of legal error and (2) is supported by substantial evidence.'" See Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2006) (*citing* Moore v. Comm'r of the Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002)); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

According to the Ninth Circuit, "[l]ong-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and actual findings offered by the ALJ - - not *post hoc* rationalizations that attempt to intuit what the

adjudicator may have been thinking." <u>Bray v. Comm'r of SSA</u>, 554 F.3d 1219, 1226-27

(9th Cir. 2009) (*citing* <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196 (1947) (other citation

omitted)); <u>see also</u> <u>Molina v. Astrue</u>, 2012 U.S. App. LEXIS 6570 at *42 (9th Cir. April

2, 2012) (Dock. No. 10-16578); <u>Stout v. Commissioner of Soc. Sec.</u>, 454 F.3d 1050,

1054 (9th Cir. 2006) ("we cannot affirm the decision of an agency on a ground that the

agency did not invoke in making its decision") (citations omitted). In the context of social

security appeals, legal errors committed by the ALJ may be considered harmless where

the error is irrelevant to the ultimate disability conclusion when considering the record as

a whole. <u>Molina</u>, <u>supra</u>, 2012 U.S. App. LEXIS 6570 at *24-*26, *32-*36, *45-*46; <u>see</u>

<u>also</u> 28 U.S.C. § 2111; <u>Shinsheki v. Sanders</u>, 556 U.S. 396, 407 (2009); <u>Stout</u>, <u>supra</u>, 454

F.3d at 1054-55.

<u>DISCUSSION</u>

    1.  <u>The ALJ failed to evaluate properly the medical evidence</u>.

       "A treating physician's medical opinion as to the nature and severity of an

individual's impairment must be given controlling weight if that opinion is well-

supported and not inconsistent with the other substantial evidence in the case record."

<u>Edlund v. Massanari</u>, 2001 Cal. Daily Op. Srvc. 6849, 2001 U.S. App. LEXIS 17960 at

*14 (9th Cir. 2001) (*citing* SSR 96-2p, 1996 SSR LEXIS 9); <u>see also</u> 20 C.F.R. § 416.902

(treating physician is one who provides treatment and has "ongoing treatment

relationship" with claimant). However, "[t]he ALJ may disregard the treating physician's

opinion whether or not that opinion is contradicted." <u>Batson v. Commissioner of Social</u>

Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004) (*quoting* Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician or psychologist. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996) (*citing* Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991); Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990)). Even if a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Lester, supra, 81 F.3d at 830-31 (*citing* Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995)). The ALJ can accomplish this by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick, supra, 157 F.3d at 725 (*citing* Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).

In addition, the ALJ must explain why her own interpretations, rather than those of the doctors, are correct. Reddick, supra, 157 F.3d at 725 (*citing* Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988)). However, the ALJ "need not discuss *all* evidence presented." Vincent on Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (per curiam). The ALJ must only explain why "significant probative evidence has been rejected." Id. (*quoting* Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981)).

In general, more weight is given to a treating medical source's opinion than to the opinions of those who do not treat the claimant. Lester, supra, 81 F.3d at 830 (*citing* Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987)). On the other hand, an ALJ need

not accept the opinion of a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical findings or by the record as a whole. Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004) (*citing* Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001)); see also Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, supra, 81 F.3d at 830 (citations omitted); see also 20 C.F.R. § 404.1527(d). A non-examining physician's or psychologist's opinion may not constitute substantial evidence by itself sufficient to justify the rejection of an opinion by an examining physician or psychologist. Lester, supra, 81 F.3d at 831 (citations omitted). However, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan, supra, 242 F.3d at 1149 (*citing* Magallanes, supra, 881 F.2d at 752). "In order to discount the opinion of an examining physician in favor of the opinion of a nonexamining medical advisor, the ALJ must set forth specific, *legitimate* reasons that are supported by substantial evidence in the record." Van Nguyen v. Chater, 100 F.3d 1462, 1466 (9th Cir. 1996) (*citing* Lester, supra, 81 F.3d at 831); see also 20 C.F.R. § 404.1527(d)(2)(i) (when considering medical opinion evidence, the Commissioner will consider the length and extent of the treatment relationship).

a. Dr. Crabbe, treating physician (psychiatrist)

In her written decision, the ALJ included the following discussion regarding the opinions of Dr. Crabbe, plaintiff's treating psychiatrist:

In June 2007, Richard Crabbe, M.D., wrote a letter indicating that "I agree with the assessment of Dwight Bushue" and that "I do not have any more to add or subtract" (internal citation to Exhibit 13F). I give no weight to Dr. Crabbe's opinion. First he merely agreed with Dr. Bushue's assessment without providing any supporting explanation. Second, the record indicates that he saw the claimant only twice. With the exception of being unable to recall three items, the claimant had a fairly normal mental status examination in December 2006 and a normal mental status examination in February 2007 (internal citation to Exhibit 16F). There is no evidence that Dr. Crabbe saw the claimant after February 2007. Accordingly, I find that Dr. Crabbe's opinion is not supported by his treatment notes.

(Tr. 22).

The first reason provided by the ALJ for her failure to give controlling weight to the opinions of Dr. Crabbe was that "he merely agreed with Dr. Bushue's assessment without providing any supporting explanation" (id.). If the two sentences quoted by the ALJ comprised the entirety of Dr. Crabbe's treatment records and opinion, this reason by the ALJ would be compelling. See Batson, supra, 359 F.3d at 1195. However, Dr. Crabbe, plaintiff's treating psychiatrist, examined plaintiff on at least five occasions and performed at least five mental status examinations of plaintiff (Tr. 414, 415-17, 542, 543, 544), as discussed already by the Court, see supra, BACKGROUND section. The Court also notes that much of the evidence rejected by the ALJ, as well as the evidence that the ALJ failed to discuss, provides support in the record for Dr. Crabb's opinion. See Vincent, supra, 739 F.2d at 1394-95 (quoting Cotter, supra, 642 F.2d at 706-07) (the ALJ must explain why "significant probative evidence has been rejected").

Second, the ALJ erroneously found that "the record indicates that he saw the claimant only twice" (Tr. 22). However, Dr. Crabbe examined plaintiff at least five times and performed at least five mental status examinations of plaintiff (Tr. 414, 415-17, 542,

543, 544), as discussed already by the Court, see supra, BACKGROUND section.

Similarly, the ALJ relied on a finding that "there is no evidence that Dr. Crabbe saw the claimant after February 2007" (Tr. 22), when Dr. Crabbe evaluated plaintiff on June 15, 2007; July 16, 2007; and January 28, 2008 (see Tr. 542-44). Furthermore, the ALJ relied on this erroneous finding to find further "that Dr. Crabbe's opinion is not supported by his treatment notes" (Tr. 22). The Court concludes that not one of these three findings by the ALJ is supported by substantial evidence in the record as a whole.

The ALJ failed to mention three of the mental status examination performed by Dr. Crabbe when she provided her own interpretation of the notes in Dr. Crabbe's report regarding plaintiff's mental status examinations. The only other reason provided by the ALJ for her failure to give controlling weight to the opinions of plaintiff's treating psychiatrist, Dr. Crabbe, was the ALJ's own assessment of two of the five of the mental status examinations performed by Dr. Crabbe (see Tr. 22 (*citing* Exhibit 16F)). However, when an ALJ seeks to discredit a medical opinion, she must explain why her own interpretations, rather than those of the doctor, are correct. Reddick, supra, 157 F.3d at 725; see also Blankenship, supra, 874 F.2d at 1121 ("When mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professional trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation") (*quoting* Poulin v. Bowen, 817 F.2d 865, 873074 (D.C. Cir. 1987)).

The Court notes that "experienced clinicians attend to detail and subtlety in behavior, such as the affect accompanying thought or ideas, the significance of gesture or mannerism, and the unspoken message of conversation. The Mental Status Examination allows the organization, completion and communication of these observations." Paula T. Trzepacz and Robert W. Baker, The Psychiatric Mental Status Examination 3 (Oxford University Press 1993).

The Court also notes that mental status examinations generally are conducted by medical professionals skilled and experienced in psychology and mental health. Although "anyone can have a conversation with a patient, [] appropriate knowledge, vocabulary and skills can elevate the clinician's 'conversation' to a 'mental status examination.'" Trzepacz, supra, The Psychiatric Mental Status Examination 3. A mental health professional is trained to observe patients for signs of their mental health not rendered obvious by the patient's subjective reports, in part because the patient's self-reported history is "biased by their understanding, experiences, intellect and personality" (id. at 4), and, in part, because it is not uncommon for a person suffering from a mental illness to be unaware that his "condition reflects a potentially serious mental illness." Van Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996).

Here, trained psychiatrist, Dr. Crabbe, assessed plaintiff's mental status following examination and provided specific opinions regarding plaintiff's ability to work. The ALJ gave no weight to these opinions (see Tr. 22).

Regarding the December, 2006 mental status examination performed by Dr. Crabbe, the ALJ concluded that other than "being unable to recall three items, the

claimant had a fairly normal mental status examination" (internal citation to Exhibit 16F) (Tr. 22). However, in making this determination, the ALJ failed to mention Dr. Crabbe's objective observation of plaintiff's "constricted, sad affect" (see Tr. 22; see also Tr. 416). Dr. Crabbe indicated that he had assessed plaintiff and found him to be depressed (see Tr. 416). Dr. Crabbe also assessed that plaintiff's GAF was 50, another opinion by treating physician Dr. Crabbe that was not discussed by the ALJ (Tr. 416; see also Tr. 22).

Similarly, the ALJ concluded that plaintiff had "a normal mental status examination in February 2007 (internal citation to Exhibit 16F)" (Tr. 22). Again, the ALJ failed to mention Dr. Crabbe's objective observation that plaintiff demonstrated constricted affect (see Tr. 414). The Court concludes that the ALJ failed to explain adequately why her interpretations of Dr. Crabbe's mental status examination results and observations are more correct than those of treating psychiatrist, Dr. Crabbe. See Reddick, supra, 157 F.3d at 725.

Based on the relevant record and for the reasons stated above, the Court concludes that the ALJ failed to evaluate properly the opinions of treating physician, Dr. Crabbe. The ALJ failed to provide specific and legitimate reasons supported by substantial evidence in the record to discount Dr. Crabbe's opinions, see Lester, supra, 81 F.3d at 830-31, and some of the opinions of Dr. Crabbe were not evaluated at all by the ALJ. In this context, the Court notes that the ALJ also did not discuss Dr. Crabbe's diagnosis of ADHD, yet the ALJ found this not to be a severe impairment (see Tr. 22). The medical opinion of a treating physician "as to the nature and severity of an individual's impairment must be given controlling weight if that opinion is well-supported and not

inconsistent with the other substantial evidence in the case record." See Edlund, supra, 2001 Cal. Daily Op. Srvc. 6849, 2001 U.S. App. LEXIS 17960 at *14 (*citing* SSR 96-2p, 1996 SSR LEXIS 9).

For the reasons stated and based on the relevant record, the Court concludes that the ALJ failed to evaluate properly the medical evidence and that this error was not harmless. Therefore, this matter should be reversed and remanded to the Commissioner for further administrative proceedings.

b. Dr. Terilee Wingate, Ph.D. ("Dr. Wingate")

Dr. Wingate evaluated plaintiff at least twice, once in 2004 and once in 2005 (Tr. 321-61). She conducted mental status examination on both occasions (see id.). Although very similar, the two treatment reports demonstrate some important differences, such as that in her 2005 evaluation, Dr. Wingate diagnosed plaintiff with borderline personality disorder (Tr. 322; see also Tr. 337). Not only did Dr. Wingate not diagnose plaintiff with borderline personality disorder at her May 5, 2004 evaluation, but also, on January 14, 2005, Dr.Wingate emphasized that plaintiff's borderline personality disorder then was the primary diagnosis (Tr. 322, 337). Dr. Wingate assessed that plaintiff's limitations were similar in January, 2005 as they were in May, 2004, however, she found that he was more limited in his social abilities and in his ability to learn new tasks and perform routine tasks (see Tr. 323, 338).

The ALJ discussed Dr. Wingate's opinions (Tr. 29-30) and included the following discussion in her written decision:

> I give significant weight to Dr. Wingate's May 2004 opinion because it is supported by the mental status examination and generally consistent with the claimant's mental health records.
>
> . . . .
>
> I discount Dr. Wingate's January 2005 opinion. First her assessment of cognitive factors is not supported by the fairly normal mental status examination. The claimant obtained a total score of "29" out of "30" on the mini mental status examination. He missed one point only because he reported the date incorrectly. Moreover, he completed the Trails A and B in faster time than he did in the May 2004 evaluation with Dr. Wingate. I therefore find no basis for the different conclusions reached by Dr. Wingate in May 2004 and January 2005 regarding the claimant's cognitive functioning. Second, I give little weight to her assessment of the claimant's social factors because it is based solely on the claimant's subjective report. As discussed above, I find that the claimant is not fully credible.

(Tr. 30).

Again, the Court notes that psychological doctors are trained to attend to detail and subtlety in behavior and not all of this information is likely to be detailed in the doctor's written report. See Trzepacz, supra, The Psychiatric Mental Status Examination 3. By concluding that plaintiff's mental status examination was "fairly normal," the ALJ provided her own interpretation of plaintiff's mental status examination without the benefit of any of the objective observations of Dr. Wingate that Dr. Wingate did not explicitly record in her treatment report. However, the test results detailed by the ALJ provide substantial support in the record for the ALJ's finding that Dr. Wingate's report did not detail the reasoning which formed the basis of Dr. Wingate's opinions regarding plaintiff's cognitive functioning.

The ALJ also gave little weight to Dr. Wingate's opinion regarding plaintiff's "social factors because it is based solely on the claimant's subjective report" (Tr. 30). The

Court concludes that this finding by the ALJ is not supported by substantial evidence in the record as a whole. Dr. Wingate performed an extensive and thorough mental status examination and reported many of her objective observations (see Tr. 321-35). For example, Dr. Wingate observed that plaintiff was "very agitated about being seen without his spouse" (Tr. 323). Dr. Wingate also included in her treatment record the reports from plaintiff's wife that he was "obsessively cleaning and picking up things, yet unfocused," and that he was "easily angered" (id.). Dr. Wingate's inclusion of her objective observations and reports from plaintiff's wife indicates that Dr. Wingate did not base her opinion regarding plaintiff's limitations on social abilities "solely on the claimant's subjective report" (see Tr. 30; see also Tr. 321-35).

In addition, Dr. Wingate's opinions regarding plaintiff's limitations in social abilities is consistent with plaintiff's medical record, see supra, BACKGROUND section, and Dr. Crabbe's opinion, which was not evaluated properly by the ALJ. Therefore, for these reasons discussed, based on the relevant record and because the Court already has concluded that this matter should be reversed and remanded to the Commissioner for further administrative proceedings, see supra, section 1.a, the Court concludes that Dr. Wingate's opinions should be evaluated anew following remand of this matter.

c. ARNP Bushue

The ALJ also committed errors in her review of some of the other medical evidence. For example, the ALJ indicated that she was giving no weight to ARNP Bushue's opinions in part because he "merely filled out a check-in-the-box form without

providing any narrative explanation" (Tr. 31). However, ARNP Bushue provided a narrative explanation in support of his opinion, including that plaintiff had "struggled occupationally for many years due to his mental health difficulties" (Tr. 354). ARNP Bushue continued with his assessment that plaintiff suffered "from depression and social phobia" (<u>id.</u>). The ALJ's error suggests that ARNP Bushue's opinion was not evaluated thoroughly and demonstrates that one of the ALJ's reasons for discounting ARNP Bushue's opinions was not proper. For these reasons and based on the relevant record, the Court concludes that ARNP Bushue's opinions should be evaluated anew following remand of this matter.

    d. Dr. C. Richard Johnson, M.D. ("Dr. Johnson") and the ALJ's duty to develop record

    The ALJ gave no weight to plaintiff's treating psychiatrist, discounted a set of opinions from his examining psychologist, but gave "great weight" to a medical expert who never examined plaintiff and only reviewed his medical records (<u>see</u> Tr. 32). In doing so, the ALJ may have relied on an interpretation of Dr. Johnson's testimony that was not entirely accurate (<u>see</u> <u>id.</u>).

    Similar to the opinion of Dr. Wingate, which was discounted by the ALJ, Dr. Johnson testified that plaintiff's primary impairment was a dependent personality disorder. The ALJ indicated that although Dr. Johnson noted that plaintiff had demonstrated a problem holding onto jobs, "the medical expert could not conclude that it was a result of the personality disorder" (<u>id.</u>).

Rather, Dr. Johnson testified that he could not conclude that plaintiff's problem holding down jobs was *solely* a result of his personality disorder. In fact, the Court finds, based on a review of the relevant record, that on this topic, Dr. Johnson's testimony was ambiguous. Dr. Johnson, at one point, testified that "I think it's caused by his personality disorder" (Tr. 623). Therefore, this testimony by Dr. Johnson supports the conclusion that plaintiff's inability to maintain his jobs was a result of his personality disorder, at least in part. Dr. Johnson testified as follows:

| | |
|---|---|
| Attorney: | Yes. Dr. Johnson, I want to kind of turn to your last answer first. [Plaintiff] has a rather extensive documented history of inability to remain at jobs longer than a short period of time, either because he is fired from the job, or he has quit. Are you saying you don't believe that is caused by his mental impairments? |
| Dr. Johnson: | I think it's caused by his personality disorder. |
| Attorney: | Okay, so his poor work history is caused by his personality disorder? |
| Dr. Johnson: | Well, I wouldn't say that is the only cause. You know, I really can't answer that question with any specificity. I don't know the circumstances. But those things where he quit, I think he voluntarily quit. He could have chose (sic) not to quit. |
| Attorney: | Yes. And then, my question is, would it be typical for an individual with the personality disorder and other problems that you've described to quit the job rather than persevere? |
| Dr. Johnson: | You know, again, I can't generalize to that answer. |

(Tr. 622-23).

The Court concludes that Dr. Johnson's ambiguous testimony should not have been afforded great weight. Although the ALJ gave Dr. Johnson's testimony "great weight," it is not clear to what extent the ALJ relied on this ambiguous testimony (Tr.

22). If the ALJ sought to rely on Dr. Johnson's testimony in order to support her finding that plaintiff's potential primary diagnosis of personality disorder did not affect his ability to hold down a job, then the ALJ had a duty to develop the record further on this issue. See Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001) (the ALJ's duty to supplement the record is triggered if there is ambiguous evidence or if the record is inadequate to allow for proper evaluation of the evidence); see also Tonapetyan, 242 F.3d at 1150. Therefore, the Court concludes that Dr. Johnson's testimony should be evaluated anew following remand of this matter.

For the reasons discussed and based on the relevant record, the Court concludes that the medical evidence was not evaluated properly and should be evaluated anew following remand of this matter.


2. Plaintiff's testimony and credibility should be evaluated anew following remand of this matter.

The ALJ found that plaintiff's completion of a jewelry making training program combined with his expectation that he would begin working in this area within the year to be inconsistent with plaintiff's allegation that he was not capable of full time gainful work activity (see Tr. 25). The ALJ also relied on other potential inconsistencies in plaintiff's testimony (see Tr. 22-25 (comparing plaintiff's alleged limitation from lifting over 10 pounds to the indication from plaintiff's wife that he could lift up to 30-40 pounds and to the treatment report that plaintiff injured his hand "bowling a lot"). However, a determination of a claimant's credibility relies on the assessment of the

medical evidence, <u>see</u> 20 C.F.R. § 404.1529(c), and the Court already has determined that the ALJ failed to evaluate properly all of the medical evidence, <u>see</u> <u>supra</u>, section 1. Therefore, plaintiff's testimony and credibility should be evaluated anew following remand of this matter.

   3. <u>The lay evidence, as well as the five steps of the five-step disability evaluation procedure, should be evaluated anew following remand of this matter</u>.

   Pursuant to the relevant federal regulations, in addition to "acceptable medical sources," that is, sources "who can provide evidence to establish an impairment," <u>see</u> 20 C.F.R. § 404.1513 (a), there are "other sources," such as friends and family members, who are defined as "other non-medical sources," <u>see</u> 20 C.F.R. § 404.1513 (d)(4), and "other sources" such as nurse practitioners and chiropractors, who are considered other medical sources, <u>see</u> 20 C.F.R. § 404.1513 (d)(1). <u>See also</u> <u>Turner v. Comm'r of Soc. Sec.</u>, 613 F.3d 1217, 1223-24 (9th Cir. 2010) (<i>citing</i> 20 C.F.R. § 404.1513(a), (d)); Social Security Ruling "SSR" 06-3p, 2006 SSR LEXIS 5, 2006 WL 2329939. An ALJ may disregard opinion evidence provided by "other sources," characterized by the Ninth Circuit as lay testimony, "if the ALJ 'gives reasons germane to each witness for doing so." <u>Turner</u>, <u>supra</u>, 613 F.3d at 1224 (<i>citing</i> <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001)); <u>see also</u> <u>Van Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996). This is because "[i]n determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work."  <u>Stout v. Commissioner,</u>

Social Security Administration, 454 F.3d 1050, 1053 (9th Cir. 2006) (*citing* Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993)).

The ALJ explicitly relied in part on her review of the medical evidence in order to support her failure to credit fully the lay evidence (see, e.g., Tr. 28, 29, 31). This Court already has determined that the ALJ failed to evaluate properly the medical evidence, see supra, section 1, and that plaintiff's testimony should be evaluated anew following remand of this matter, see supra, section 2. Therefore, the Court concludes that all of the lay evidence should be evaluated anew following remand of this matter.

Similarly, plaintiff's residual functional capacity ("RFC") depends on an assessment of the entire record. As the medical evidence, lay evidence and plaintiff's testimony and credibility should be evaluated anew following remand of this matter, plaintiff's RFC likewise should be evaluated anew. For the reasons discussed and based on the relevant record, the Court concludes that all five steps of the five-step sequential disability evaluation process should be evaluated anew following remand of this matter. Plaintiff should be provided with a *de novo* hearing and should be allowed to present new evidence and arguments, as relevant, following remand.

4.  This matter should not be remanded with a direction for an award of benefits.

The Ninth Circuit has put forth a "test for determining when evidence should be credited and an immediate award of benefits directed." Harman v. Apfel, 211 F.3d 1172, 1178, 2000 U.S. App. LEXIS 38646 at **17 (9th Cir. 2000). It is appropriate where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Harman, 211 F.3d at 1178 (*quoting* Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir.1996)).

Here, outstanding issues must be resolved. See Smolen, 80 F.3d at 1292. Although the ALJ did not evaluate the opinions of Dr. Crabbe properly, it is not clear from the record that she would be required to find plaintiff disabled were such evidence credited. See Harman, *supra*, 211 F.3d at 1178.

In addition, the Court notes that the ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995). If the medical evidence in the record is not conclusive, sole responsibility for resolving conflicting testimony and questions of credibility lies with the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1999) (*quoting* Waters v. Gardner, 452 F.2d 855, 858 n.7 (9th Cir. 1971) (*citing* Calhoun v. Bailar, 626 F.2d 145, 150 (9th Cir. 1980))).

Therefore, remand is appropriate to allow the Commissioner the opportunity to consider properly all of the medical evidence as a whole and to incorporate the properly considered medical evidence into the consideration of plaintiff's credibility and residual functional capacity. See Sample, *supra*, 694 F.2d at 642.

The ALJ relied improperly on her own interpretation of mental status examination results over the interpretation of the treating psychiatrist who performed the examinations, Dr. Crabbe. The ALJ's failure to credit fully an opinion of Dr. Crabbe also was based on erroneous findings.

Based on these reasons and the relevant record, the undersigned recommends that this matter be **REVERSED** and **REMANDED** to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g). **JUDGMENT** should be for **PLAINTIFF** and the case should be closed.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of de novo review by the district judge. See 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on June 1, 2012, as noted in the caption.

Dated this 10th day of May, 2012.

J. Richard Creatura
United States Magistrate Judge